Mr. Bins, good morning. Good morning, your honors. My name is James Bins, and I represent the appellant, Shamsuddin Ali. I would like to reserve three minutes of my time for rebuttal. Fine. We are here today seeking a new trial because the trial judge abused his discretion in admitting substantial, prejudicial, and irrelevant evidence of drugs in a case that was non-drug related. Mr. Ali was indicted as a participant in a RICO enterprise, and the enterprise consisted of Mr. Ali, his wife Farida, a school, the Sister Clara Muhammad School, a company, Keystone Information Financial Services, and a second company, Hyde Technology Recycling Management, and it was alleged that there were certain co-conspirators who acted with them, none of whom were drug dealers. Prior to the trial, we filed a motion in limine to exclude any evidence of drugs or reference to drugs because we received tapes and we received a witness list from the government, and we had extensive discussions concerning this. The judge denied our motion in limine, and then proceeded to allow the government to, in essence, try a drug case against Shams Al-Din Ali when it was never alleged that he was a drug dealer or in any way participated in the activities of the individuals who the government then called as witnesses and played tapes regarding them. Was your argument in the motion in limine that the evidence was inadmissible, you just said irrelevant, or was your argument that even if admissible, it was prejudicial? We argued in the first instance that it was irrelevant because in order for there to be a balancing test under Rule 403, there first has to be a finding that it was relevant evidence. This evidence couldn't have been more irrelevant, but the court found that it was relevant, and without conducting an in-depth balancing analysis, as is called for in Ruflesio and DiSalvo, ruled that it could be the topic of the government's case-in-chief. Why wasn't it relevant to establish that there was an existence and enterprise, and that receipts from drug dealing were monies that were used to preserve and maintain the enterprise, and that was the purpose of it? Because that's not what the cases call for, Your Honor. The Ruflesio case, which is the only case the judge relied upon, although two cases were advanced by the government, Ruflesio and DiSalvo, were clear in their mandates as to why such evidence should be admissible and how it's admissible to prove the existence of an enterprise. The enterprises in those cases were the Scarfo crime family. The defendants in one case, the Ruflesio case, the defendants were actual members of the crime family. Mr. Idone was a capo. Mr. Ufresia and Mr. Icona were members of the crime family, and the evidence that they were complaining about was the testimony of Messrs. Caramante and Del Girido, who likewise were members of the crime family, and their testimony went to crimes, in one case a murder, that were committed, and to establish the existence of the enterprise and these particular defendants' participation in it. The same is true of DiSalvo. In DiSalvo, the two defendants, Mr. Salone and Mr. DiSalvo, were complaining about the testimony of Felipe Leonetti, once again the charged with drug dealing. Exactly. The evidence of the drug dealing is solely for purposes of establishing the existence of the enterprise. But it doesn't do it, Your Honor. The existence of the enterprise is established by showing what the enterprise did in using the Sister Clara Mohammed School, using the KIFS, which is the acronym for Keystone Informational System, and high tech. They could have very easily, if they wanted to say that, and they did, say that the Allies misused money that was donated to the Sister Clara Mohammed School. They showed where unions had donated money to the Sister Clara Mohammed School, and the government allegedly found its way into the bank accounts of the Allies. They could have said that these other people gave money, then there was no need for them to say that the Allies misused money. But in any event, it is not the case. The fact that the government is not restricted in its use of evidence, simply because there are other sources of evidence, maybe that goes to the prejudice part. It does go to the prejudice part, because they didn't ever have to use the fact that there were funds that were misused, could have been said just by saying that, and they could have proved it by saying that. But they started the drug beat with the indictment, which was then leaked to the press. At the voir dire, a lady got up and said, I can't serve, this is a drug case. No, the judge said it's not a drug case. She said, well, I couldn't be fair if there's any mention of drugs whatsoever. In his opening statement, the prosecutor referred to drugs, drug trafficking and drug proceeds 17 times. It was an opening statement. This trial lasted for approximately four weeks. It opened on the 22nd of April and they rested on the 23rd of May. I would say trial days, there may have been somewhere between 14 and 18. Half of those trial days were devoted to proving evidence of receipt of drug money. How did they do it? After their trial, they asked them to bring an agent, an FBI agent. What do you do, agent? Well, I've been with the FBI for 25 years. 22 of them I've investigated drugs. I overheard a conversation that Mr. Ali participated in. I recognized his voice and I even knew his home phone number. Then they started playing tapes of dead men, drug dealers, and in none of those tapes were there any references to drugs or to any payment to Mr. Ali for drugs, but the fact that that man was a drug dealer was highlighted by whom? The FBI agent. Yes, I investigated him. Then they brought in a witness, Gerald Saunders, drug dealer, convicted drug dealer. He then recited a litany of people who were parishioners at the Jackson and Ali's mosque who were all drug dealers. They never called those people. There was no way to get those people and he never said that Mr. Ali was complicit in any drug deals and all he said was that from time to time they would call me up and they would ask me to pay money for a pickle bowl, money for an oil bill, and one time they said that they were looking for money to give to a lady who needed $5,000 and she worked for the city government. The government then bootstrapped that into some conspiracy. That was proof that Mr. Ali was extorting a government employee for a contract. They never proved it. They never even alleged it. That was a whole other story when we went before Judge Wilberino to try to get him to quash the wiretaps. To try to make sure that the jury did not use evidence of drug dealing against the Ali's, it seemed to be very carefully worded instructions were given to the jury, even before the evidence began, before openings, and throughout the I have to quote Justice Jackson back in 1949, the naive assumption that prejudicial effects can be overcome by instructions for the jury. All practicing lawyers know to be unmitigated fiction and that is what happened here. And if you read the judge's colloquy with the you can prove the enterprise. But they're not involved in the enterprise. You're losing me there. And he said it time and time again. And we argued until the cows came home that this was wrong. After they finished with Mr. Saunders, then they called another drug dealer, convicted drug dealer, who blurted it out. They said he dealt drugs. Now the judge struck it as hearsay or my objection. But nonetheless, it was out there. And then at one point, they actually called another defendant. And at that point was the first time that I said, Judge, I'm going to have to move from this trial here. They withdrew. If the jury had convicted wholesale, every defendant on every charge, you would lend credence to your position. But that's not what they did. Your Honor, I understand that this is the time for this judicial restraint. But if there's a case that cries out for a reversal, this is the one because of the drug beat that they then carried into their closing. And they said it four times again. And at one point, they said, why didn't we have Agent Agnew? Agent Agnew got up there and not call him an agno and just said, well, there was $400,000 in Mrs. Aldi's account over X number of years. When the only drug dealer they called who was the only thing I paid for was an electric bill, an oil bill, and $1,000 randomly at some other time. And so there was no question about why they were doing what they were doing. If they wanted to prove the RICO conspiracy, they charged them with eight separate crimes. They charged them with 11 different racketeering acts. None of them had 52 counts. None of them had anything to do with drugs. Why would they harp on this drug business? From the very beginning, prior to Poitiers, through Poitiers, through their opening, all of the witnesses, they spent about half of this trial. The government says, well, we only did it for a couple of days. That isn't true. They spent about a week doing this with regard to the agent. Every time Agent Coleman got on the stand, he would identify a conversation with another drug dealer. Not that there was anything said that had anything to do with Mr. Aldi receiving this money that he was supposedly known as drug money. Nothing like that whatsoever. Just for the sake of blading out these names, Yusuf, Ahmed, Farouk. I know you don't argue for the government, but what evidence would you point to that the government could use to establish an enterprise? The enterprise was the use of, the government said that there were five entities that made up the enterprise. The enterprise that the government could have and should have proven was that Mr. Aldi controlled these companies and used those companies to either extort money from the government or to get contracts that he wasn't otherwise entitled to or extort money from the coal people with regard to giving them waste removal contracts. There were plenty of places for them to go. This had nothing whatsoever to do with the enterprise that they sought to establish. It had nothing whatsoever to do with the conduct of the Ali's. They just blurted it out there. How would the government explain the great amounts of cash that were otherwise unexplainable if you could not tell what the source was? You could just simply say that X gave the money. If X gave it, they never had that testimony. The only thing they had, Your Honor, was a revenue wage, a retired revenue wage that got up there and said, I looked at a bank account and there was X in the bank account. There was never any nexus between that money and any of the drug dealers. The most of the drug dealers testified to was, I paid an electric bill, I paid an oil bill, and I gave them a thousand dollars. Now, I know the electric bills are pretty high in Philadelphia, and maybe even the oil ones are too, but it's not going to get from a thousand plus X plus Y to 400,000. They left that out and it was closing. Mr. Rabin even said that. Mr. Binns said that why did we call Agent Agnew? Well, I'll tell you why. Because Agent Agnew said she had $400,000 in her account. It's just, it's a disconnect. Let me ask if there's any other questions. Good. We'll have you back on rebuttal. Thank you. Thank you very much, Mr. Binns. Mr. Lieber. Good morning. Good morning, Your Honor. Good morning, members of the court. Frank Lieber, on behalf of the United States of America. To obtain a new trial here, Shams Al-Ali has to show that the district court abused its discretion. He has to show that the court's analysis of the Rule 403 objection was arbitrary, fanciful, or unreasonable. He has to show that no reasonable person would accept the view that the district court expressed below. He cannot do that. He cannot do that here because the record of this case establishes that the district court did exactly what this court has instructed the trial courts to do when confronted with a Rule 403 objection. What does the record show? First, the district court held a hearing on the objection. In fact, he held three hearings, one pre-trial, one during trial, and one post-trial. What occurred during those hearings? First, the district court evaluated the relevance of the government's evidence and evaluated the need for the government to put that evidence into the case. The court also explored whether there were alternative methods of proof available to the government, and the court made record findings that the government was substantially probative of an essential element of the chief charges in this case. Proof of a racketeering enterprise that went to count one, which was racketeering, and count two, which was racketeering conspiracy. You say, Mr. Labor, that there was alternative evidence, evidence other than drug use, to establish before the jury enterprise? I said the district court explored whether there was other evidence that the government could have used in lieu of the drug money evidence. What did that exploration reveal? The district court addressed the question to me several times during the argument, why can't you just say that the money came from some illegal source? He also asked the defendant if they would stipulate along those lines. The defendant refused that, and as I argued to the district court, you can't just, and as Judge Schroeder aptly pointed out, you just can't allege in the indictment that this was a criminal enterprise that made money through illegal means. There's $400,000 going into this enterprise, but we're not going to tell you where it came from. So they answered the question, Your Honor, there was no alternative evidence to substitute in lieu of the drug money evidence. Mr. Bitz says, at least in his brief, that there were contributions made by labor organizations to the enterprise. That would have been sufficient to establish that there was an enterprise. No, that would have been sufficient to prove one racketeering act. One racketeering act was that the Ollies ripped off the people. They were soliciting donations to their school. It was a real school. It was a legitimate school, and they were ripping that, the unions off by taking that money and spending it on themselves, buying cruises, $1,000 shoes, things of that nature. That's one racketeering act. That's what that evidence was admitted to, to prove that racketeering act. It's not enough to prove the enterprise. And really, two things you have to keep in mind. Was it safe to say you could do it without evidence of drug dealing? Your Honor, if the district court had ruled against us, and we had somehow managed to convince the jury that this was a racketeering enterprise, and I was here today defending the sufficiency of the evidence, I would certainly make that argument. I would make that argument under the Turquette analysis. The Turquette is a Supreme Court case that says the proof of the enterprise is a separate element from the pattern of racketeering activity. They can coalesce. Sometimes they can prove both things, but it may not be enough. If we had somehow been lucky enough to prove to the jury that there was a racketeering enterprise without that evidence, I'd certainly be here saying that it was sufficient. But as this court said in Euphragio, Rule 403 does not require that the government pull its punches. We don't have to, Rule 403 doesn't prohibit the government from putting on its strongest case. We had evidence to show that the independence, there was an independent existence of this enterprise. It's separate and apart from the racketeering acts that were charged, and we certainly had the right to put it on. The only caveat was that it was unfairly prejudicial. Tell us what the enterprise consisted of. Yes, Your Honor, that's really, to understand the court's analysis, you have to begin at the end of the indictment. What was the enterprise? The theory of the indictment in this case was that Shams Al-Ali and his spouse, Farida Ali, created, operated, and maintained an organization that had a continuous operation. Its purpose was to obtain money for the personal benefit of Farida Ali and Shams Al-Ali through illegal activities and from illegal sources. They did that by using their actual and perceived influence as leaders of the school, as leaders in the community. They did it by influencing people who were vulnerable to them, people such as the drug dealers. They did it through deceit and deception. They created the appearance, the patina of legitimacy. It's a real school. We're trying to educate our children. I'm a member of the clergy. But in fact, they were just racketeers. The object was to get money from illegal sources through illegal means. They used deceit, deception, and their influence. That was the theory of the indictment. They used Sister Clara Muhammad School. How does the drug dealing fit into all of that? Your Honor, the drug dealing tied it all together. And the most important thing it did, it responded to the Turkett requirement that the enterprise be something, have an existence separate from the mere pattern of racketeering activity. Because what the drug evidence showed was that this was an ongoing organization whose associates worked together as a continuous unit. The other thing you have to keep in mind is not just simply the theory of the indictment. You have to, and this is what Mr. Vince kind of left out, the defense theory. The defense hotly contested the claim that this was an enterprise. The defense theory was that this was, trying to recall the exact words in their motion, random paid crimes cobbled together to create the appearance that these people were racketeers. And it's not just simply that there's no enterprise. The other component of the defense was, and this came out through the cross-examination of the witness and the closing, this was an entirely legitimate organization. This was a man of the cloth. He was a clergyman. This was a school. It was a real school. It had classes and teachers. There's nothing illegal about this. We were presented with a situation. The theory of the indictment was that they were making a lot of money from illegal means through illegal sources for their own benefits. And we did that with a special agent I knew. Well, what I don't follow is you could show that they received money through the no-show jobs, for example. Just as you showed that the school, the Sister Clowder School, received money from illegal drug trade, why would you choose one over the others? Is it because of the way you indicted the defendants in the acts that you chose? You understand it alone. We had all the money that went into the organization that they spent on themselves. Agent Agnew was able to trace portions of that money to the community college fraud scheme. He was able to trace portions of that money to the union fraud scheme. But there was $400,000 in cash deposits that came into the enterprise that they used for themselves that came from a source other than Sister Clowder. Now, what was the jury to think when they went back into the room? What do we make of that evidence? Labor says it's an illegal enterprise. It came from illegal sources and illegal means. Mr. Bin says it's a church. It's a school. Without the evidence to show the common thread, the common objective, the common purpose, the common manner and means of how they operated, we don't have the enterprise. We have random petty crimes cobbled together that don't make out an enterprise. And so what the drug evidence did was tied all that activity into an enterprise to show that it was ongoing, that it was continuous, had a common purpose, common objectives, common participants, and that it just simply wasn't the crimes that were alleged in the pattern of racketeering. It was an ongoing enterprise. And, Your Honor, that, so we had the theory, that was the theory of the indictment that we had approved. We had the hot defense, aggressive defense. You also have to take a look, it's not in the appendix, but I will give you the citation. You have to look at the jury instruction on what constitutes an enterprise. It's on, it's on volume, the June 7th, 2005. It's on page 36 through 38. And it's not, it's a standard racketeering instruction. It's based on Turquette and Riccobini. I just want to read you a very snippet of it. Again, it says, the instruction on what the government has to prove beyond a reasonable doubt to make out the element of enterprise. And here the enterprise was an association, in fact, of individuals and entities. An association of persons may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the people making up the association functioned as a continuing unit. To establish the existence of an enterprise, the government must prove that, one, there is an ongoing organization with some sort of framework for making decisions. Two, the various members and associates of the association functioned as a continuing unit to achieve a common purpose. And three, that the enterprise is separate and apart from the pattern of racketeering activity in which it engages. In other words, it has a separate existence from the pattern of racketeering activity. That's what we have to prove beyond a reasonable doubt. That's what the defense was hotly contesting. And that's why the district court made the findings. This evidence is relevant and appropriate, and it's necessary to prove an essential element of the government's case. And bear in mind, this is not, this is neither novel evidence nor novel precedent. The evidence that we presented, and I must disagree with Mr. Binns in his, the weight of the evidence, this was a nine-week trial. It began in April. It ended in June. The government called over 30 witnesses, but Agent Coleman was called, I think, 17 times. Agent Agnew was called a dozen times. So really, to prove different aspects of the pattern of racketeering activity. So really, there were about 50 witnesses. We had 200 tape recordings. This is a wiretap case. The government's star witness was the defendant because he was on every conversation. We had 200 wiretap conversations. The drug evidence consumed less than one day of trial testimony. It was two witnesses. It was 30 tapes. It was not pervasive. Mr. Binns says that you had discussed a stipulation so that presumably you could avoid introducing these witnesses. What did that stipulation provide for? Well, Judge Coffman asked in the middle of the argument if Mr. Binns would stipulate, stipulate that rather than getting into the, where the money actually came from and calling the people who knew, had that personal knowledge, just stipulate that it was money from some illegal source. Was it the stipulation to the existence of an enterprise or was it to the drug evidence? It would have been in lieu of the drug evidence. There was certainly no requirement that they stipulate to the existence of the enterprise. In the absence of a stipulation, the judge could not have instructed that it came from an illegal source. Isn't that true? Yeah, that goes to the old chief case. I would say no, that he couldn't, he can't force the government to investigate. It's a jury's decision. Yes, it would be up to the jury. And once he made the findings that the evidence is relative, relevant, necessary, and not unfairly prejudicial, the evidence comes in. So far you've argued that it was relevant. You haven't argued about the prejudicial component of Rule 403. Yes, Your Honor. Once Judge Gauffin made the relevancy findings, he had to do a record balancing analysis, which he did. It's in the record, it's cited in the briefs. He compared and let me just talk about the findings. He said that the evidence had substantial appropriate value. And in his finding, he kind of did it in the reverse because the burden is on the defendant to show that the unfair prejudice substantially outweighs the appropriate value. It's not a little bit, it's not a preponderance. He doesn't have to just tip the scales. He has to show that it substantially outweighs the appropriate value. And what Judge Gauffin said was the substantial probative value of the government's evidence far outweighs any risk of unfair prejudice. And again, the court simply cannot say that Judge Gauffin abused his discretion in that finding. First of all, bear in mind, Rule 403 creates a presumption of admissibility. So there is a presumption that the evidence comes in unless there's a showing that it substantially outweighs the relative value, the relevant value. We don't have to, it doesn't prohibit us from putting on our strongest case. We can put on our most prejudiced case as long as it's not unfairly prejudicial. Faced with that, that's one half of the equation, the relevance of the substantial probative value and the necessity. On the other hand, what's the prejudice? And Judge Gauffin said, I can't see any specific prejudice. Yes, there's some possibility that people will draw some negative inference because he's associating with drug dealers, but we can handle that. We can address that with appropriate limiting instructions and limitation of the evidence. And in fact, Judge Gauffin did strike a lot of our evidence. He struck one witness under Rule 403 and a couple of times during the presentation of the witnesses we did call, he cut off the examination because he thought it was far, strained too far. I didn't get to see the final instruction. Did the final instruction include the instructions concerning the use of drug evidence? Your Honor, Judge Gauffin did not repeat the limiting instruction. I don't believe the defendant asked him to. So, Your Honor, the district court, you can't find that Judge Gauffin abused his discretion. He did exactly what he's supposed to. He had a hearing, made record findings, found that the probative value far outweighed the risk of unfair prejudice and used appropriate measures to prevent the risk of unfair prejudice. And as Judge Fuentes pointed out, the verdict confirms that. This was a very careful verdict. They spent a week in deliberation. They acquitted one defendant. They found some predicate acts. The other predicate acts weren't found. Some decisions, they were hung. They followed the instructions. It was a very careful decision. And there's simply no suggestion that the jury was tainted by anything here. Any further questions? Thank you, Mr. Laper. Thank you, Your Honor.  Mr. Laper made the best argument I could make. He said that they called 50-some witnesses. They only called one witness to testify as to making contributions that were misused. And that was Mr. Saunders, who said he paid an electric bill, he paid an oil bill, and he gave him $1,000. Now that he leapt over to Agent Agnew, who has $400,000 in there, if they had people come and say, I gave $100,000, I gave $25,000, and if Mr. Ali was involved in their business, then they would fit right inside the rubric of refugio and dissolvo. But they don't. If they wanted to show that these people had $400,000 in their bank account, they should have had some witnesses say it. They didn't. They had witnesses say that he got in there was never explained to the jury, and it certainly couldn't have come from any drug dealers, because the only one they put on the stand said that he gave a pittance. It couldn't have amounted to $2,000. And so they keep just blurting out, well, the phrase here says you can show the enterprise this way. But that's not what that evidence was calculated to do. That evidence was only calculated to inflame these jurors that this man was somehow involved in drug trafficking, drug dealing, and was somehow complicit in what these other people may have or may have not done. And remember that this isn't even evidence of other crimes under 404. There's no allegation that Mr. Ali committed any crime with these people. Now, if you examine Uffrazio and examine dissolvo, that's what those cases were about. And that's the, Uffrazio was the only case that the judge in this case relied upon. And if you wonder, did he have the same questions that you posed, Judge Fuentes, throughout his colloquy? That's all he talks about. Under 403, a concern with a prejudicial effect. At least one of these jurors said that he feels he could, she felt he could be guilty of other things, particularly when he's not charged as a drug dealer. He must have said that 10 times throughout that. And at one point, Mr. Lager said, I agree, it is prejudicial. But that's, he said, then he went on to say that the Third Circuit says it's fine to show the structure of the enterprise, the continuity, and all the elements we have to prove. But he's already told you that they had quantums of proof over a nine-week period that made this evidence of the drug trafficking by these other people, not Ali, fade into the woodwork. So why did they do it? There's only one answer to that. They did it to achieve exactly what they accomplished. They started out pre-indictment, and they ended up with their closing. 17 times in their opening. If that, if they weren't trying a drug case, why would they use those words 17 times in their opening? Why? Because they wanted to influence the mindset of these jurors, just as they influenced the panel through what they leaked to the newspapers. And what the jurors stood up and said, I just can't be fair here. And the judge said, throughout the colloquy that you can see in the appendix, why do you have to use drugs? Why can't you just say, are you saying that they extorted money from these people? Well, not exactly. I asked the agent, are you saying to me that they extorted money? Well, no. And the drug dealer testified, I wanted to help out the drug dealers. I said, well, it's $10,000. That has nothing to do with proving the enterprise. Because all what they wanted him to say was, they wanted him to recite the litany of names of people that he was involved with, his suppliers. And that's what he talked about. And the judge allowed it. That's an abuse of discretion. It's not relevant. Was there any stipulation that you had proposed or that you would have agreed to? Yes. That they could have simply said, these people gave money to Shamsuddin Ali and his wife, and they misused the money. And that would have done it for them, Your Honor. That would have accomplished what they say now that they're trying to save it. They wanted to accomplish that somehow there's $400,000 that got into this account. Well, there's no witness that said how it got in there. And the fact that it got in there from a drug dealer is meaningless. It could have been somebody who sold holy water. You referred to these people. Were you referring to the judge who said these drug dealers? The drug dealers, that's who I was referring to, sir. No, but in the instruction, you would have had the judge say the money came from these drug dealers? No, I wouldn't have had him say anything. He didn't want to say anything about drug dealers. He wrestled with this. He slept on it overnight. He pleaded with them not to do it. And incidentally, he didn't rule off that one witness they called. I said that I was going to move for a mistrial. The government, they had already sworn a witness. The judge says, I want you to think about this, Mr. Labor, over lunch. They came back and they withdrew their own witness because they knew they had gone beyond the pale. It was bad enough with Saunders. It was worse with Coleman. It was awful with Wideman. Forget his name. He had a very recognizable name. Iyamin, that was his name. And they had the kind of names that they were trying to get in front of these jurors. I mean, the names were unbelievable. And he said, yeah, he was my supplier. Yeah, I dealt crack with him. I dealt methamphetamine with him. It had nothing to do with anything other than to prejudice these people against Shamsuddin. They started at the very beginning and they ended, and they didn't leave him alone after they called the witness. They went back to it at their closing. The judge gave me the discretion. I have wonderful regard for this judge. He did the best he possibly could under the circumstances, but they wouldn't give him an ounce of redeeming. Thank you very much, Mr. Vins. The case was very well argued. We will take the matter under advisory. Thank you, Your Honor. The next matter is...